GREAT LAKES OVERSEAS, INC., Plaintiff–Appellant,

v.

WAH KWONG SHIPPING GROUP, LTD., Defendant–Appellee.

No. 91–3581.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 30, 1992.

Decided April 13, 1993.

---

Kent M. Bridwell (argued), Joseph H. Cummins, Cummins & White, Los Angeles, CA, for plaintiff-appellant.

Lawrence Gunnels, Amy B. Eisenberg, Mark I. Levy (argued), Alan N. Salpeter, Amy B. Folbe, Mayer, Brown & Platt, Chicago, IL, for defendant-appellee.

Before CUDAHY and EASTERBROOK, Circuit Judges, and LEE, District Judge.*

CUDAHY, Circuit Judge.

Great Lakes Overseas, Inc. (GLO), a shipping agent, entered an agency agreement with a freight liner service, KKL (Kangaroo Lines) Pty., Ltd. (KKL), under which GLO booked cargo, quoted rates and issued bills of lading in exchange for a commission for all cargo carried aboard KKL's ships. GLO had performed such services for more than two years when a liquidator assumed control of KKL, ceasing its business activities when KKL owed GLO sizable commissions for cargo already delivered or already booked. Unable to obtain relief from KKL, GLO has turned to the defendant, Wah Kwong Shipping Group, Ltd., asserting that a series of agreements or arrangements between Wah Kwong and the liner service established a partnership or alter-ego relationship that made Wah Kwong responsible for KKL's debts to GLO and subjected it to suit in Illinois, or, alternatively, that Wah Kwong is subject to jurisdiction in Illinois under the Illinois long-arm statute because its actions in Illinois caused injury. The district court dismissed the case with prejudice for want of personal jurisdiction. We affirm in part and reverse in part.

* The Honorable William C. Lee, of the Northern District of Indiana, is sitting by designation.

## I.

Since resolution of this case turns on the nature of the relationships among the various parties, a detailed recounting of the facts is required. The plaintiff, GLO, is a shipping agent for corporations that transport ocean marine cargo. GLO is wholly owned by the Singapore corporation Cometa Shipping Pty. Ltd. (Cometa), which is at least 40 percent owned by Trygve Vangsnes, a Norwegian living in Australia. Wah Kwong Shipping Group, Ltd. (Wah Kwong), a corporation organized under Hong Kong law, is the parent holding company of a group of subsidiary companies, including Maritime Shipping & Investments, Ltd. (MSI), which owns ocean-going vessels, and Venture Shipping Managers, Ltd. (VSM), which manages and operates ocean-going ships. Hong Kong residents Frank and George Chao were the chief executives and managers of Wah Kwong and various subsidiaries. Karlander (Australia) Pty. Ltd. (Karlander) was an Australian company operating a liner service out of Australia. Karlander chartered until 1983 vessels from the shipowning companies in which MSI owned shares, at which time Karlander was reorganized and the liner service separately incorporated as KKL. KKL was an Australian company of which Vangsnes was owner and chief executive officer.

On August 1, 1983, GLO entered into a General Agency Agreement with KKL. Under the agreement, GLO would receive commissions as KKL's shipping agent for booking cargo, quoting rates, issuing bills of lading and performing other related services. The agency agreement stated that it was to be governed by Illinois law.[1]

GLO had performed services for KKL from August 1983 to December 1985 when in January 1986 a liquidator assumed control of KKL and discontinued its operations. KKL owed GLO substantial com-

missions at the time: $1.2 million for cargo already booked, carried and delivered and $2 million for cargo booked but not yet delivered. Having unsuccessfully sought compensation from KKL through the liquidation proceedings, GLO targets Wah Kwong in this case based upon a series of agreements between Wah Kwong or its subsidiaries[2] and KKL. The agreements, GLO argues, established a partnership or alter-ego relationship between the companies that made Wah Kwong responsible for KKL's debts to GLO. Among these agreements were the Loan Facility, the Heads of Agreement, the Supplemental Agreement, the Assignment of Earnings and various ancillary agreements.

In March 1983, Wah Kwong and Karlander entered into a "Loan Facility" under which MSI would provide up to $6 million to Karlander to pay off overdue charterhire on vessels Karlander had chartered from shipowning companies in which MSI and VSM had interests. When charterhire debts grew, Karlander's owners decided to restructure the company by forming KKL to operate the Australian–U.S. liner service; KKL undertook Karlander's charters with the shipowning companies and assumed outstanding charterhire that had not been paid off. About the same time, Wah Kwong sought advice from its accountants, who suggested five ways Wah Kwong might respond to the restructuring and the unpaid charterhire, including the injection of $6 million as a loan to KKL.

On November 26, 1983, Karlander, KKL and Wah Kwong executed the Heads of Agreement. Noting that Karlander was indebted to Wah Kwong and that Karlander's successor, KKL, required financial assistance to pay off Karlander's creditors, the agreement provided that MSI would make a $6 million interest-free deposit, repayable on demand, with a finance company established as a wholly owned subsid-

---

1. Specifically, the agreement stated that "[a]ll actions or proceedings arising directly or indirectly from this Agreement shall be litigated only in courts having sites within Illinois and the parties herein agree to be subject to the jurisdiction thereof." Agency Agreement § 5 ¶ 5.

2. For simplicity's sake, we will sometimes refer to the group of shipowning companies or individual Wah Kwong subsidiaries as "Wah Kwong."

iary of KKL. The finance company then would advance the deposit to KKL, which would advance the money to Karlander to pay off the outstanding charterhire. As security for the $6 million deposit, KKL granted MSI an option to acquire half of KKL's stock. The agreement also authorized MSI to appoint two members of KKL's board of directors, to appoint a financial consultant to KKL and to approve KKL's auditors. The Heads of Agreement provided that English law would apply.

The Heads of Agreement stated it would not become effective until additional documents were executed. One such document, a side letter signed the same day as the Heads of Agreement, noted that repayment of the $6 million deposit "is by mutual agreement instead of on demand." A Supplemental Agreement, executed on January 10, 1984, to give effect to the Heads of Agreement, warranted that KKL's total outstanding debts were not more than $10.6 million and noted that if that representation were false, MSI would be entitled to demand repayment of the $6 million.[3] The Supplemental Agreement confirmed that MSI would appoint two directors to KKL's board—one of whom was needed for a quorum—and established a two-person committee, including one MSI-nominee, to monitor KKL's cash flow and recommend guidelines for payments to creditors. Like the Heads of Agreement, the Supplemental Agreement provided that it was to be governed by English law. In accordance with the agreements, on February 6, 1984, VSM drew a check on MSI's account payable to the finance company, Engum Holdings, for $6 million. Engum endorsed the check to KKL, which endorsed it to VSM as the shipowners' agent in payment of outstanding charterhire.

Yet another agreement, the Assignment of Earnings (executed on March 2, 1984), provided for the assignment of KKL's and Karlander's earnings related to vessel operation to VSM as "security for the various

obligations" to MSI and VSM. The agreement provided that KKL's earnings would be paid to VSM-designated bank accounts, though such earnings first would be applied to charterhire due to shipowners. This agreement also stated that it was governed by English law. A side letter sent the next day by VSM and signed by KKL confirmed that the "purpose of this Assignment" was "to protect the Charterhire earnings" of the Wah Kwong ships. Wah Kwong states that the Assignment of Earnings was never implemented.

In April 1984 the parties agreed that the finance committee provided for in the Supplemental Agreement would be replaced by an arrangement in which the Wah Kwong-nominated members of the KKL board would examine KKL's various expenditures. In June 1984 Wah Kwong requested, on advice from its accountants and lawyers, that all KKL checks be signed jointly by Wah Kwong and KKL representatives. Vangsnes, concerned about the interruption of the day-to-day operations of KKL's liner service, agreed to a compromise requiring that Wah Kwong representatives discuss and approve KKL's payments before they are made. In August 1984, however, Vangsnes agreed to the joint-signature requirement for KKL checks, noting that the Chaos had assured him they would be available at all times to ensure that day-to-day liner operations would not be interrupted.

## II.

We set out to determine whether the district court erred in concluding that it lacked personal jurisdiction over the defendant in this case. The parties' widely divergent characterizations of the facts tell markedly different stories; our task is to decipher a remarkably tangled set of facts.

*The Partnership Theory*

 GLO first argues that KKL and Wah Kwong were partners, and therefore

---

**3.** A side letter sent by MSI the day following the Supplemental Agreement stated that MSI could demand repayment of the $6 million if KKL materially exceeded the $10.6 million debt it represented. The letter stated that otherwise KKL's repayment would be by mutual agreement. On February 22, 1984, George Chao sent Vangsnes a notice of default indicating that KKL's total outstanding debts exceeded $10.6 million.

that Wah Kwong, like KKL, was subject to suit by GLO in Illinois.[4] According to GLO, a partnership existed because Wah Kwong had a right to receive a share of KKL's profits, agreed to share KKL's losses and exercised general control over KKL. We agree with the district court that English law applies, especially since the agreements that allegedly form the basis of the partnership specify English law. And Illinois courts generally give effect to contractual choice of law clauses. *See, e.g., Sumner Realty Co. v. Willcott,* 148 Ill.App.3d 497, 101 Ill.Dec. 966, 499 N.E.2d 554 (1986), *appeal denied,* 113 Ill.2d 585, 106 Ill.Dec. 56, 505 N.E.2d 362 (Ill.1987). Under English law, the party asserting the existence of a partnership has the burden of proof, *Saywell v. Pope,* [1979] S.T.C. 824, 53 T.C. 40, LEXIS Enggen Library at 15 (Ch. Oct. 4, 1979), and must demonstrate an agreement between the companies to carry on a business together. *See* 1890 Partnership Act § 1(1) (defining a partnership as "the relation which subsists between persons carrying on a business in common with a view of profit"); *Strathearn Gordon Associates Ltd. v. Commissioners of Customs and Excise,* [1985] VATTR 79, LEXIS Enggen at 11 (London VAT Tribunal June 17, 1985). Whether a partnership exists depends upon the circumstances of each case. *Saywell,* LEXIS at 11.

■ Central to the partnership issue is the characterization of Wah Kwong's $6 million payment to KKL. Wah Kwong and the district court describe the transaction as a loan that was part of a workout arrangement through which Wah Kwong could obtain the charterhire KKL owed it. GLO, on the other hand, asserts that the $6 million was not an enforceable debt obligation but essentially an equity investment by Wah Kwong in a partnership with KKL.

As Wah Kwong points out, the record contains abundant references by representatives of both parties to the $6 million transaction as a loan. The Heads of Agreement and related documents used the term "loan" to describe the transaction; similarly, various items of correspondence between the parties involved refer to the amount in terms suggesting a loan transaction. *See, e.g.,* Letter of Nov. 11, 1988, from Trygve Vangsnes at 1, App. A157 (referring to the loan transaction between Wah Kwong Group and Engum); Letter of June 18, 1985, from George Chao to Trygve Vangsnes, App. 150 (stating that Wah Kwong's chairman would not consider further business with KKL "until the loan of ... 6,000,000 is fully repaid by you to us"); Letter of June 12, 1985, from Trygve Vangsnes to Sinclair Roche, App. 149 (stating that Vangsnes "presume[s] loan is repayable only repeat only by agreements of the parties").

Reliance upon terminology—which seems especially indeterminate with such complex dealings at issue—is, however, an inappropriate means for uncovering the nature of the transaction.[5] We instead strive to understand the substance of the arrangement.

When KKL's failure to pay charterhire persisted, Wah Kwong consulted its accountant, Price Waterhouse. Price Waterhouse suggested five options to Wah Kwong, one of which was to "inject [in United States dollars] 6 million or some lesser amount as loan capital taking as security (a) a floating charge over the assets and undertaking of the company and (b) an option to purchase the shares in KKL...." Upon Price Waterhouse's ad-

---

**4.** Wah Kwong contends that GLO has waived any argument on appeal that KKL and Wah Kwong were partners under English law by basing its argument in the district court on Illinois law. We do not agree that GLO's focus on Illinois law precludes it from making the partnership argument on appeal, regardless of which jurisdiction's law applies.

**5.** We likewise refrain from giving inordinate weight to the various references to KKL and Wah Kwong as "partners" or to their association as a "partnership." Although we question Wah Kwong's explanation that terms such as "partnership" and "investment" were not legally significant because they were casually employed by foreign businessmen in their lay sense, we nevertheless conclude that the use of such terms is not necessarily indicative of the substance of the relationship.

vice, Wah Kwong's subsidiary, MSI, made an interest free "deposit," repayable upon demand, to Engum Holdings, the finance company established as a wholly owned subsidiary of KKL. Under the agreement, the finance company was to provide the money to KKL, which would advance it to Karlander to pay outstanding charterhire. Consistent with Price Waterhouse's suggestions, KKL granted MSI an option to acquire 50 percent of KKL's stock as security for the $6 million deposit[6] and authorized MSI to appoint two members to KKL's board of directors. Subsequent agreements modified or confirmed the terms of the transaction; for example, a side letter accompanying the Heads of Agreement stated that repayment of the $6 million "is by mutual agreement instead of on demand," and the Supplemental Agreement stated that MSI "shall be entitled (but not bound) to demand repayment" of the $6 million if KKL's representation that its total outstanding debts did not exceed $10.6 million was untrue.

Underscoring the language in the side letters indicating that the $6 million was repayable only by "mutual agreement," GLO argues that the $6 million payment did not create an enforceable obligation and therefore was not a loan. Plaintiff's Br. at 33. GLO argues, moreover, that the absence of an explicit loan agreement supports its view that the payment was an investment rather than a loan. GLO's argument is for the most part confined to assorted stabs at isolated facets of what appears to be an intelligible overall portrayal of the relationship by Wah Kwong. Using such an approach, GLO is hard-pressed to contradict the relatively coherent and logical story that Wah Kwong relates and the apparently rational explanations offered by Wah Kwong.[7] Given these facts, we conclude that the only reasonable characterization of the $6 million transaction is as a loan. Accordingly, KKL's association with Wah Kwong—at least with respect to this particular transaction—signifies a debtor-creditor relationship, not a partnership.

We also agree with the district court's view that Wah Kwong did not have the right to share in KKL's profits. Under English law, the right of a party to receive a share of the profits of a business is prima facie evidence that the party is a partner in the business. *Cox v. Hickman*, 8 H.L.C. 268, 276, 11 Eng.Rep. 431 (H.L.1860); *Saywell*, LEXIS at 13. But the Assignment of Earnings agreement states that it served only as "security for the various obligations" to MSI. This casts serious doubt upon GLO's depiction of Wah Kwong as KKL's partner on the basis of a claim on profits, particularly given that Wah Kwong never received a share of KKL's earnings as such. English statutory law and case law reinforce this conclusion.[8]

Similarly, the facts do not support GLO's contention that Wah Kwong agreed to share KKL's losses. GLO makes much of one document's provision that "[c]are will be taken to ensure that day to day liner

---

**6.** No Wah Kwong company ever exercised this option.

**7.** For example, Wah Kwong successfully refutes GLO's point about the $6 million being repayable by mutual agreement rather than on demand and therefore not being a debt obligation or loan. First, Wah Kwong points out that even if such a qualification prevented the $6 million from being an enforceable obligation, the Supplemental Agreement provided that Wah Kwong was entitled to demand repayment if KKL's debt level exceeded a specified amount that was, in fact, ultimately exceeded, according to the February 1984 notice of default George Chao sent to Mr. Vangsnes. Second, English law has recognized the existence of loans where the borrower is obligated to repay, even when repayment is specified to be made by mutual agreement. *See Neilson v. Stewart*, [1991] S.L.T. 523, 527 (H.L.). Admittedly this is an unusual form of "debt" obligation, but it still appears to resemble debt more than it does equity.

**8.** English courts, for example, have concluded that a debtor-creditor relationship does not establish a partnership. *See Mollwo, March & Co. v. Court of Wards*, 4 L.R. 419, 438 (P.C.1872) (stating that the contract at issue, instead of signaling a partnership, "is really and in substance what it professes to be, viz., one of loan and security between Debtors and their Creditor"). Section 2(3)(a) of the Partnership Act of 1890 likewise states that "[t]he receipt by a person of a debt ... out of the accruing profits of a business does not of itself make him a partner in the business or liable as such."

service operation will be maintained without any interruption" and of a Wah Kwong official's statement that Wah Kwong representatives would "be available at all times, day or night, to make sure that day-to-day liner operations will not be interrupted." These statements do not suggest Wah Kwong's intent to devote its own funds to pay KKL's expenses or to ensure KKL's continuing operations as much as they simply confirm that Wah Kwong was striving to protect its own financial interest and, specifically, the charterhire KKL owed it. There is no reason to believe that the statement about the round-the-clock availability of Wah Kwong representatives, in particular, constitutes anything but a reassurance that these representatives would be constantly available to prevent the joint signature requirement from causing any hitches in regular operations. At any rate, neither statement demonstrates that Wah Kwong was committed to pay KKL's operating expenses.

Finally, the various agreements Wah Kwong had with KKL were not sufficient to indicate that Wah Kwong controlled KKL. GLO depicts the series of agreements KKL and Wah Kwong entered into—the Loan Facility, the Heads of Agreement, the Supplemental Agreement and the Assignment of Earnings—as creating a partnership whereby Wah Kwong invested in KKL and directed its activities. But the agreements can be fairly characterized only as components of a workout arrangement between debtor and creditor. Indisputably Wah Kwong's involvement with KKL was not trifling. The essence of this admittedly close corporate relationship, however, was an arrangement by which Wah Kwong could attempt to obtain the charterhire due and coming due on the ships chartered to KKL. The conclusion that Wah Kwong's engagement with KKL was not a partnership is bolstered considerably by the Price Waterhouse recommendations to Wah Kwong, which confirm that the relationship was designed to protect

Wah Kwong's large creditor position. The oversight that Wah Kwong exercised over KKL to that end did not transform Wah Kwong into KKL's partner. *See* 35 Halsbury's Laws of England, *Partnership* ¶ 17 (4th ed. 1981) (stating that "a lender may stipulate for large powers, some of which might be consistent with the position either of a creditor or a sleeping partner, [yet] if such powers are reasonably necessary for the protection of his interest as a lender, they will not be held to make him a partner"). The financial embarrassment that apparently enveloped KKL during the period involved here makes a creditor rather than a partner role for Wah Kwong more plausible.

*The Alter Ego Theory*

█ In addition to the partnership theory, GLO argues that KKL was the alter ego or instrumentality of Wah Kwong, and therefore that Wah Kwong should be held accountable for KKL's debts. The parties disagree on whether Illinois law or English law applies to this determination.[9] Under either jurisdiction's law, however, the evidence does not support a conclusion that KKL was "a mere instrumentality," *Matter of Bowen Transports, Inc.*, 551 F.2d 171, 179 (7th Cir.1977), or a "mere facade concealing the true facts." *Woolfson v. Strathclyde Regional Council*, [1978] S.L.T. 159, 161 (H.L.).

Both English law and Illinois law require a degree of control by one entity over another that simply is not present here. Under Illinois law, courts will pierce the corporate veil only when, first, there is "such unity of interest and ownership that the separate personalities [of the corporations] no longer exist" and, second, when circumstances are "such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Sea–Land Services, Inc. v. Pepper Source*, 941 F.2d 519, 520 (7th Cir.1991).

With respect to the first prong, the power that GLO alleges Wah Kwong wielded

---

**9.** Although Wah Kwong contends that GLO, by relying in the district court solely on Illinois law, has waived any claim that foreign law would treat KKL as Wah Kwong's alter ego, we conclude that GLO's arguments on the alter ego question were adequate to preserve the issue on appeal.

over KKL neither demonstrates a merger of corporate identities nor approaches the required "unity of interest." The record indicates no failure to keep separate corporate records or to comply with corporate formalities and no undercapitalization or commingling of funds. *Van Dorn Co. v. Future Chemical & Oil Corp.*, 753 F.2d 565, 570 (7th Cir.1985); *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1345 (7th Cir.1987), *cert. denied*, 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988). Although some common directors served both Wah Kwong and KKL, that fact alone is insufficient to confer jurisdiction under Illinois law. *See, e.g., People v. Parsons Co.*, 122 Ill.App.3d 590, 78 Ill.Dec. 74, 80, 461 N.E.2d 658, 664 (Ill.App.1984). And as to the second prong, even if this case did involve corporate entities only fictionally distinct, we cannot conclude that this court's recognition of the separate entities would work an injustice. GLO's allegation that Wah Kwong bled KKL of funds mischaracterizes what were essentially Wah Kwong's attempts to enforce its security interests.[10]

English law, much like Illinois law, will pierce the corporate veil and recognize one entity as the alter ego of another "only where special circumstances exist indicating that [the relationship of one corporation to another] is a mere facade concealing the true facts." *Woolfson v. Strathclyde Regional Council*, [1978] S.L.T. 159, 161 (H.L.). The degree of control Wah Kwong exercised over KKL does not approximate that required to support a characterization of KKL as Wah Kwong's alter ego under English law. A recent English case, *Atlas Maritime Co. v. Avalon Maritime Ltd.*, 4 All E.R. 769 (C.A.1991), represents the weight of English authority. That case found no justification for piercing the corporate veil to hold a parent company responsible for the debts of its wholly owned subsidiary even where the subsidiary was created to conduct the business at issue and was funded entirely by loans advanced by the parent.[11] *Id.* at 779; *see also Burman v. Hedges & Butler Ltd.*, [1979] 1 W.L.R. 160, 164, 167 (Ch.); *Ford & Carter Ltd. v. Midland Bank Ltd.*, New Law Journal 543, 544 (May 31, 1979) (H.L.). Wah Kwong injected funds into KKL and sought various means of oversight to protect its security interest. At no time did Wah Kwong's and KKL's corporate existences converge or even overlap to any meaningful extent, and the record fails to disclose the kind of fraud or manipulation of corporate structures that might bring the Wah Kwong–KKL association within reach of the alter ego doctrine.

*The Illinois Long–Arm Statute*

The plaintiff's third theory on which to found jurisdiction is based on the Illinois long-arm statute. Although the parties give less attention to this theory than they do to the partnership and alter ego arguments, whether the long-arm statute supports jurisdiction may be a much closer question.

The Illinois long-arm statute provides, in relevant part, that a person is subject to jurisdiction in Illinois if the cause of action arises from "[t]he transaction of any business" within the state of Illinois. Ill.Rev. Stat. ch. 110, ¶ 2–209(a)(1). On appeal, GLO asserts that the district court, in focusing on the Illinois contacts of a Wah Kwong accountant and of a Wah Kwong-associated nominee to GLO's board, ignored the actions of a Wah Kwong shipping agent that caused direct injury to GLO. Wah Kwong, apparently concerned that KKL's creditors would arrest KKL-chartered ships arriving on the West Coast,

---

10. Courts applying Illinois law have refused to recognize corporations as alter egos of dominant corporations even where one corporation subsidized another and where the corporations shared some directors or officers. *See, e.g., People v. Parsons Co.*, 122 Ill.App.3d 590, 78 Ill.Dec. 74, 80, 461 N.E.2d 658, 664 (1984); *cf. Secon Service System Inc. v. St. Joseph Bank & Trust Co.*, 855 F.2d 406, 413–17 (7th Cir.1988) (applying Indiana law).

11. In determining whether the parent-subsidiary relationship was that of debtor-creditor or principal-agent, the lower court in *Atlas Maritime* noted that the subsidiary's operations were entirely financed and managed by the parent company and that the subsidiary had "no business existence save in bare legal terms." *See* 4 All E.R. at 774.

contracted with that agent, Williams Dimond & Co., to deliver incoming cargo and to pay off creditors with the proceeds. GLO argues that some of this cargo—that delivered to Illinois—otherwise would have been delivered by GLO and generated commissions to GLO; accordingly, GLO says, GLO's injury arose from Wah Kwong's agent's actions in Illinois and Wah Kwong therefore should be subject to personal jurisdiction under the Illinois long-arm statute.

Assuming GLO was injured by the loss of commissions and that a Wah Kwong agent was in fact transacting business in the state of Illinois, the pivotal question remains whether GLO's "cause of action" can be accurately described as "arising from" this specific transaction. Wah Kwong argues that GLO's cause of action arises not from Dimond's delivery in Illinois but from Wah Kwong's earlier acts that allegedly put KKL out of business and deprived GLO of its commissions under the GLO–KKL agency agreement. According to Wah Kwong, the fact of delivery in Illinois is irrelevant, because even if Dimond had not arranged delivery of any of the cargo, GLO's claim, based on the contention that, but for Wah Kwong's acts, GLO would have delivered the cargo bound for Illinois, would still be the same.

At first blush Wah Kwong's account of this issue seems to be splitting hairs. That is, the scope of GLO's claim absent Dimond's delivery of cargo would not seem necessarily to signify that related actions could not themselves trigger personal jurisdiction. Nevertheless, for a claim to arise out of Wah Kwong's transaction of business in the state, liability must "lie in the wake of the commercial activities by which [the] defendant submitted to the jurisdiction of Illinois courts." *Heritage House Restaurants, Inc. v. Continental Funding Group, Inc.*, 906 F.2d 276, 281 (7th Cir. 1990) (citing *Deluxe Ice Cream Co. v. R.C.H. Tool Corp.*, 726 F.2d 1209, 1215 (7th Cir.1984)). Here, liability arises from the alleged breach of the agency agreement between KKL and GLO. Although GLO's contention that Dimond's delivery constituted part of the breach of contract has

some appeal, that delivery in Illinois is too remote from the acts comprising the core of that breach to be construed as integral to it. Count I of GLO's complaint asserts breach of the agency agreement between GLO and KKL, alleging that Wah Kwong is liable because it was KKL's partner or joint venturer. Especially since we have determined that KKL was neither Wah Kwong's partner nor its alter ego, we cannot now recognize personal jurisdiction based upon actions so detached from those constituting KKL's breach. We therefore conclude that personal jurisdiction was not established under the Illinois long-arm statute.

### III.

The facts of this case are not sufficient to subject Wah Kwong to personal jurisdiction under the partnership, alter ego or statutory theories the plaintiff sets forth. We agree with GLO, however, that the dismissal should be without prejudice. For the foregoing reasons, we AFFIRM the lower court's granting of Wah Kwong's motion to dismiss, but REVERSE the dismissal with prejudice.