

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-25-1999

# So Cross Overseas v. Wah Kwong Shipping

Precedential or Non-Precedential:

Docket 98-5185

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

## Recommended Citation

"So Cross Overseas v. Wah Kwong Shipping" (1999). *1999 Decisions.* Paper 167.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/167

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 25, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-5185

SOUTHERN CROSS OVERSEAS AGENCIES, INC.,
A New Jersey Corporation;
TRANSPORT INTERNATIONAL POOL INC.,
A Pennsylvania Corporation, Appellants

v.

WAH KWONG SHIPPING GROUP LTD.,
A Foreign Corporation

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 96-cv-05887)
District Judge: Honorable Anne E. Thompson,
Chief Judge

Argued: March 25, 1999

Before: BECKER, Chief Judge, LEWIS and
WELLFORD,* Circuit Judges.

(Filed June 25, 1999)

_____

*Honorable Harry Wellford, United States Circuit Judge for the United
States Court of Appeals for the Sixth Circuit, sitting by designation.

HYMAN HILLENBRAND, ESQUIRE
  (ARGUED)
R. BRETT KELLY, ESQUIRE
De Orchis, Corsa & Hillenbrand
2650 Biscayne Boulevard
Miami, FL 33137
(Organized in New York)
1495 Morris Avenue
Union, New Jersey 07083

LAURA E. SHER, ESQUIRE
Kroll & Tract
One Gateway Center
Newark, NJ 07102-5311

Counsel for Appellants

JEFFREY W. SARLES, ESQUIRE
  (ARGUED)
ALAN N. SALPETER, ESQUIRE
Mayer, Brown & Platt
190 South LaSalle Street
Chicago, IL 60603

ROBERT B. KURZWEIL, ESQUIRE
FREDRIC R. COHEN, ESQUIRE
Katz, Ettin, Levine, Kurzweil,
 Weber & Scialabba
905 North Kings Highway
Cherry Hill, NJ 08034

Counsel for Appellee

OPINION OF THE COURT

BECKER, Chief Judge.

This suit for sums past due for transportation of cargo emerges from a setting of contractual relationships and prior litigation history so complicated and convoluted as to almost boggle the mind. It will take over thirteen pages of typescript to describe them. The case had its genesis in a now-failed Australian corporation's relationship with a still-extant Hong Kong corporation. The plaintiffs here claim to

2

have been victims of fraud by the Hong Kong corporation. Aspects of the controversy have previously been litigated in an Australian liquidation proceeding, a New Jersey bankruptcy proceeding (consolidated with a California proceeding),1 and a civil action in the United States District Court for the Northern District of Illinois. The present appeal arises from an order of the District Court for the District of New Jersey dismissing the complaint of plaintiffs Southern Cross Overseas Agencies, Inc. ("Southern Cross") and Transport International Pool Inc. ("TIP") against defendant Wah Kwong Shipping Group Ltd. ("Wah Kwong") under Fed. R. Civ. Proc. 12(b)(6) on the ground that the statute of limitations barred the action. It presents two interesting and important questions, one of which we resolve in a way that creates a circuit split.

The first issue stems from the defense that the District Court lacked diversity jurisdiction because the defendant is a Hong Kong corporation. The Court of Appeals for the Second Circuit has determined that Hong Kong corporations, being neither "citizens" nor"subjects" of a foreign state, were "stateless" and therefore do not fall within federal alienage diversity jurisdiction under 28 U.S.C. S 1332(a)(2). See Matimak Trading Co. v. Khalily, 118 F.3d 76 (2d Cir. 1997), cert. denied, 118 S. Ct. 883 (1998). We disagree.

Because the question implicates foreign policy, we requested that the government offer its views, and we now endorse the State Department's position that a Hong Kong corporation, though not a "citizen" of the United Kingdom, was a "subject" of the United Kingdom for purposes of diversity jurisdiction. At the time the lawsuit wasfiled, Hong Kong was a British Dependent Territory. While governed by laws separate from those governing the United Kingdom itself, Hong Kong was ultimately subject to British sovereignty. The British Crown had the power of final approval of its laws. Furthermore, under the relevant consular agreements, Hong Kong citizens (including corporations) were treated as United Kingdom "nationals"

_____

1. The principal asset in both the Australian liquidation and the U.S. bankruptcy came from the proceeds of a California arbitration.

3

for purposes of relations between the United Kingdom and the United States. Therefore, we agree with the District Court that we possess subject matter jurisdiction.

The second issue implicates the permissible scope of a court's inquiry on a 12(b)(6) motion. The plaintiffs filed their complaint in December 1996. The District Court granted the defendant's 12(b)(6) motion, which was grounded on the statute of limitations, because the fraudulent acts complained of occurred in the mid-1980s and the court was satisfied that New Jersey's six-year statute of limitations for fraud had long since run. The plaintiffs, however, maintain that the facts that might have given them knowledge of a probable cause of action did not come to their attention until 1992 and that they could not reasonably have been expected to know them sooner.

Resolution of the issue requires us to examine the published opinion in the earlier New Jersey bankruptcy litigation. Although this examination takes us beyond the face of the complaint, we conclude that we may take judicial notice of that opinion as a matter of public record and as a document on which the plaintiffs rely in the complaint. We further conclude that, as a matter of law, the opinion provided the bankruptcy creditors in that action with notice of the facts that should have led them to inquire into the alleged fraud. Because the plaintiffs were creditors who filed claims in that action, they should have known of the opinion. Therefore, we will affirm the District Court's conclusion that the complaint is barred by the statute of limitations.

As is already apparent, the factual and procedural background of this case is incredibly complex. Because the subject matter jurisdiction issue is a threshold matter that is distinct from the other issues before us, we address it first, and then turn to the facts and procedural history.

I. Subject Matter Jurisdiction

Wah Kwong alleges that we lack alienage diversity jurisdiction in this case because, as a corporation organized under Hong Kong law, it is "stateless" and does not fall within 28 U.S.C. S 1332(a)(2). The Supreme Court has

4

recently instructed us not to hypothesize jurisdiction, but to decide jurisdiction first and then address other issues only if there is jurisdiction. See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998). Thus, we address this issue before resolving the parties' other arguments.

Section 1332(a)(2) confers original jurisdiction on federal courts in civil actions in which the matter in controversy exceeds $75,000 between "citizens of a State and citizens or subjects of a foreign state." This tracks the language of Article III of the Constitution, which extends the federal judicial power to "all Cases . . . between a State, or Citizens thereof, and foreign States, Citizens or Subjects." Wah Kwong argues that, as a Hong Kong corporation, it is neither a citizen nor a subject of a "foreign state."[2] The District Court found that it had jurisdiction, reasoning only that federal jurisdiction in this case served the interests of "providing a neutral forum and avoiding the appearance of injustice or creating grounds for resentment in the relations of the United States with other nations." Slip Op. at 14.

A. The Second Circuit's View

The District Court's decision is in conflict with the Second Circuit's decision in Matimak. The District Court disposed of the jurisdictional issue summarily, and did not discuss Matimak. In Matimak, Judge McLaughlin, joined by Judge Jacobs, held that Hong Kong was not a "foreign state" for purposes of alienage jurisdiction and that Hong Kong corporations were not "citizens or subjects" of the United Kingdom. Matimak set forth two important principles that formed the basis for its decision.

The first concerned the definition of "foreign state":

> Neither the Constitution nor S 1332(a)(2) defines "foreign state." However, "it has generally been held that a foreign state is one formally recognized by the executive branch of the United States government."

_____

2. Diversity is to be determined at the time the complaint is filed. See Smith v. Sperling, 354 U.S. 91, 93 n.1 (1957). Hong Kong was a British Dependent Territory at the time the complaint wasfiled, and it so remained until July 1, 1997, when sovereignty was transferred to the People's Republic of China.

> 13B C. Wright, A. Miller & E. Cooper, Federal Practice
> & Procedure S 3604 (1984).

Matimak, 118 F.3d at 79. It is undisputed that Hong Kong has not been formally recognized as an independent sovereign by the executive branch. The Matimak court also found that Hong Kong was not a "de facto" foreign state, despite its status as the United States's twelfth-largest trading partner and the United States–Hong Kong Policy Act of 1992, 22 U.S.C.A. SS 5701–5732 (West Supp. 1996). That Act establishes that Congress desires close United States–Hong Kong relations to continue after Hong Kong's change from a British Dependent Territory to a special administrative region of the People's Republic of China.3 While the Act demonstrates that there is a special, close relationship between the United States and Hong Kong, that, we agree, is simply not the same as explicit recognition of foreign statehood.

Recognition matters because the Framers feared that foreign nations might become incensed if they perceived that state courts were biased against foreigners; the result could be or commercial disruption if foreign nations became incensed at the treatment of their citizens or subjects in state courts. See Matimak, 118 F.3d at 82–83. Matimak suggested that, "[w]here the Executive Branch determines that a foreign entity is not a `sovereign,' there is no threat of entanglement with a sovereign stemming from the refusal of a federal court to treat that entity's citizen in a national forum." Id. at 83. The court recognized that, if an unrecognized foreign entity perceived that its citizens had been subject to bias in a state court, there could be foreign relations repercussions, but found that it was for the executive branch to evaluate a foreign entity's autonomy and resources in order to determine whether the entity constituted a sovereign state. Thus, the risk of foreign policy entanglements was not for the court to evaluate. See id.

_____

3. The Act provides that "Hong Kong plays an important role in today's regional and world economy. This role is reflected in strong economic, cultural, and other ties with the United States that give the United States a strong interest in the continued vitality, prosperity, and stability
of Hong Kong." 22 U.S.C. S 5701(4).

The second crucial principle in Matimak concerned the definition of "citizens or subjects," and a corollary relating to corporations:

> We begin with the truism that a foreign state is entitled to define who are its citizens or subjects. United States v. Wong Kim Ark, 169 U.S. 649, 668, 18 S.Ct. 456, 464, 42 L.Ed. 890 (1898) ("Nor can it be doubted that it is the inherent right of every independent nation to determine for itself, and according to its own constitution and laws, what classes of persons shall be entitled to its citizenship."); Ruggiero v. Compania Peruana de Vapores "Inca Capac Yupanqui", 639 F.2d 872, 875 (2d Cir. 1981); Murarka v. Bachrack Bros. Inc., 215 F.2d 547, 551–53 (2d Cir. 1954); 13B C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction 2d SS 3604 & 3611 (1984).

> It is another accepted precept that a corporation, for purposes of diversity jurisdiction, is a "citizen" or "subject" of the entity under whose sovereignty it is created.

Id. at 85.

The court concluded that Hong Kong corporations were not "citizens or subjects" of the United Kingdom because the United Kingdom did not recognize such corporations as citizens. The British Nationality Act 1981, which extends privileges to natural persons in British Dependent Territories such as Hong Kong, does not apply to corporations. The British Companies Act 1948 specifies that corporations formed under the laws of Hong Kong are not entitled to the privileges of British nationality. See Matimak, 118 F.3d at 85. Given these laws, the court concluded that the alternate argument that Hong Kong corporations were ultimately subject to British sovereignty must also be rejected, reasoning that "Hong Kong corporations . . . are no more `subjects' than `citizens.' " Id. at 86. Although Hong Kong's laws might ultimately be traceable to the British Crown, the Matimak court reasoned that Hong Kong corporations were in fact incorporated under the Companies Ordinance 1984 of Hong Kong and entitled only to the protection of that law. See id.

7

Judge Altimari dissented, arguing that "[a] stateless corporation is an oxymoron." Id. at 89 (Altimari, J., dissenting). He emphasized the practical importance of Hong Kong-United States relations and the State Department's expressed view that Hong Kong corporations should be allowed to take advantage of alienage jurisdiction. He would have found diversity jurisdiction over a Hong Kong corporation on any of three grounds: (1) as a citizen or subject of a "de facto" autonomous state; (2) as a citizen or subject of the United Kingdom, given the "inexorabl[e] link[age]" between Hong Kong and the United Kingdom; or (3) as a citizen or subject of a "political subdivision" of the United Kingdom. See id. at 91-92 (Altimari, J., dissenting).

B. The Purposes of Alienage Jurisdiction

Most courts have accepted the proposition that the problem of "statelessness" was unanticipated by the Framers, because it is a twentieth-century phenomenon. "[A] basic assumption of the drafters was that anyone who was not a citizen of the United States must by definition have been subject to the power of a foreign government or sovereign." Matimak, 118 F.3d at 87. Thus, the Framers apparently considered the class of "subjects or citizens of a foreign state" as identical with the class of"aliens." See Kevin R. Johnson, Why Alienage Jurisdiction? Historical Foundations and Modern Justifications for Federal Jurisdiction over Disputes Involving Noncitizens, 21 Yale J. Int'l L. 1, 1-20 (1996).

Historical evidence from the Federalist Papers and the debates over the ratification of the Constitution shows that the Framers often "refer[red] to citizens, subjects and foreigners interchangeably." Van der Schelling v. U.S. News & World Report, Inc., 213 F. Supp. 756, 759 (E.D. Pa.), aff'd, 324 F.2d 956 (3d Cir. 1963) (per curiam). In fact, the phrase "citizens or subjects" reflected an expansive intent:

> The framers of the Constitution were undoubtedly keenly aware of the fact that they had lately been subjects and that in other lands men still remained subjects of a sovereign and not citizens of a state.. . . It was only by the inclusion of `subjects' that all aliens,

8

whether they [owed] allegiance to a sovereign monarch or were citizens of a democracy, could sue or be sued in federal courts.

. . . .

. . . . Indeed, Story's doubts appear to have been abandoned, for in his `Commentaries on the Constitution of the United States' (5th Ed., 1891) he says, at page 499:

`* * * The inquiry may here be made, who are to be deemed aliens entitled to sue in the courts of the United States? The general answer is, any person who is not a citizen of the United States. * * *'

Id. at 761 (emphasis added). Thus, while foreign modes of government are hardly "technicalities" in any other sense, the Framers apparently did not consider them relevant to the exercise of federal jurisdiction. See Johnson, supra; Bradford Williams, Note, The Aftermath of Matimak Trading Co. v. Khalily: Is the American Legal System Ready for Global Interdependence?, 23 N.C. J. Int'l L. & Com. Reg. 201, 224-25 (1997); cf. Wilson v. Humphreys (Cayman) Ltd., 916 F.2d 1239, 1242 (7th Cir. 1990) (holding that the "policies supporting alienage jurisdiction" supported jurisdiction over a Cayman Islands citizen--the Cayman Islands is also a British Dependent Territory).

Matimak rejected these and similar statements on the ground that the Framers never contemplated "statelessness." See Matimak, 118 F.3d at 87. However, without further analysis, this is an inadequate response. The Framers never contemplated telephones, and yet we have applied the Fourth Amendment to cases about telephones. See Katz v. United States, 389 U.S. 347 (1967) (overruling an earlier decision that had held that telephones, not having been within the Framers' contemplation, would not receive Fourth Amendment protection). The relevant question is whether the Framers articulated principles that assist us in this case.

We believe that they did. The history reviewed in Van der Schelling is relevant because Hong Kong's importance to the United States evokes the Framers' concerns for smooth

9

foreign relations. As two practitioners note, British Dependent Territories "are the international equivalent of Delaware or Nevada for many clients." William Wilson III & Jonathan K. Cooperman, 2d Circuit Bars Suits by "Offshore" Corporations, Nat'l L.J., Aug. 25, 1997, at B9. Because Hong Kong was a dependent territory of the United Kingdom and is now a special administrative region of the Peoples' Republic of China, the way we treat its corporations may affect our relations with those countries, not to mention our relations with Hong Kong itself. See Wilson, 916 F.2d at 1243 (exercise of American judicial authority over a citizen of a British Dependent Territory implicates our relations with the United Kingdom). The State Department expressed this concern in its submission to us.

C. Who is a "Subject" of a Foreign State?

1. The State Department's Position

The State Department's view, communicated to us by the Justice Department at our request, is that:

> [I]n the last analysis, Hong Kong nationals, including corporations, [were] subjects of United Kingdom sovereignty. While the United States views Hong Kong as largely autonomous in most respects, as a matter of recognition, it deal[t] with Hong Kong through British authorities, since Hong Kong [was] ultimately subject to United Kingdom sovereignty. The various international agreements between Hong Kong and the United States [were] identified in the State Department's authoritative "Treaties In Force" under "United Kingdom" sovereignty. The Consular Convention between the United States and the United Kingdom identifie[d] citizens of the United Kingdom's "colonies" (including corporations) as U.K."nationals" for purposes of relations between the two countries. This approach [was] mirrored in the underlying legal structure under which [a Hong Kong] corporation was created. The Letters Patent for Hong Kong issued by the British Crown [made] clear that ultimate sovereignty and authority, including final approval of all laws, [was] reserved to the British Crown. Since the

10

> ultimate sovereign authority over [a Hong Kong
> corporation was] the British Crown, [it] should be
> treated as a subject of United Kingdom sovereignty for
> purposes of alienage diversity jurisdiction.

Gov't Brief at 6-7.4

2. Citizens and Subjects

Matimak rejected the State Department's argument,
which was identical to the argument presented to us, on
the ground that Hong Kong corporations were not United
Kingdom citizens according to explicit United Kingdom law.
If they were not citizens, Matimak reasoned, they could not
be subjects. We agree with Matimak that, in general, there
is no difference between the way our federal courts deal
with "citizens" and "subjects":

> In S 1332(a)(2) the terms "citizen" and"subject" do not
> connote a different "degree of attachment or allegiance
> to a foreign state." 1 James Wm. Moore et al., Moore's
> Federal Practice P 0.75 (3d ed. 1996); United States v.
> Wong Kim Ark, 169 U.S. 649, 663-664, 42 L. Ed. 890,
> 18 S. Ct. 456 (1898) ("The term `citizen,' as understood
> in our law, is precisely analogous to the term `subject'
> in the common law, and the change of phrase has
> entirely resulted from the change of government.").
> Rather, the terms are meant to encompass persons
> living under distinct forms of government: "A monarchy
> has subjects; a republic has citizens." Moore, supra,
> P 0.75.

Matimak, 118 F.3d at 85.

The two terms are identical in that they both describe a
relationship between an individual and a sovereign power
that suffices to confer alienage jurisdiction on a federal
court. That the terms are identical for this specific purpose,
however, does not mean that a sovereign must have only
"citizens" or only "subjects." See Walter C. Hutchens, Note,
Alienage Jurisdiction and the Problem of Stateless
Corporations, 76 Wash. U. L.Q. 1067, 1081 n.81 (1998).

_____

4. At the time the brief was written, Hong Kong remained a British
Dependent Territory.

British law does not clearly establish that the British Crown recognizes only one sort of sovereign relationship. Rather, British law, while silent on the crucial issue here, seems to recognize both "citizens" and "subjects." The United Kingdom has by statute made natural persons who are citizens of Hong Kong or other British colonies subjects of the Crown. See British Nationality Act 1948, at 1. Hong Kong corporations are not covered by this statute, but the State Department's position is that Hong Kong's laws required Crown approval at the relevant time, and its conclusion that Hong Kong corporations were thus ultimately subject to United Kingdom sovereignty seems eminently reasonable. We are concerned that, were we to decide that a foreign sovereign must choose between having "citizens" and "subjects," we would be making a fairly significant foreign policy decision, and one that the State Department rejects.

3. The Role of Deference to the Executive Branch

We accord substantial weight to the State Department's position. In Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398 (1964), the Supreme Court considered the right of an instrumentality of a hostile foreign government to file suit in U.S. courts. The United States had severed formal diplomatic relations with Cuba, but had not derecognized it as a sovereign. The Court rejected the argument that a hostile government should not be allowed to litigate in U.S. courts. Sabbatino looked to the executive's position in support of its decision:

> The view that the existing situation between the United States and Cuba should not lead to a denial of status to sue is buttressed by the circumstance that none of the acts of our Government have been aimed at closing the courts of this country to Cuba, and more particularly by the fact that the Government has come to the support of Cuba's "act of state" claim in this very litigation.

Id. at 411.5

_____

5. We also note that Taiwanese citizens have been allowed to sue under alienage jurisdiction, despite formal derecognition of Taiwan by the

We will likewise take heed of the State Department's position here. We do not believe that executive authority in foreign policy matters is limited to the definition of "foreign state" for S 1332 purposes. Executive competence also extends to the definition of "citizens or subjects," at a minimum in cases where the proper interpretation is unclear and the outcome may affect our foreign policy. Just as the executive is best positioned to make the determination that recognition of a sovereign is appropriate, the executive is best situated to conclude that Hong Kong was, at the time suit was filed, so closely connected to the United Kingdom that its corporations were United Kingdom subjects.

4. Conclusion

In summary, it is established that Hong Kong corporations were not United Kingdom citizens at the time the lawsuit was filed, but it is quite plausible that they were United Kingdom subjects. The law of the United Kingdom is not entirely clear on this point. The State Department, however, has informed us that, consistent with various agreements with Hong Kong and the United Kingdom, it considers Hong Kong corporations to have been subjects of the United Kingdom for alienage diversity purposes. This, it represents, best reflects the actual relationship between the United Kingdom, Hong Kong, and the United States. There is no indication that the United Kingdom disagrees with this characterization. For the reasons set forth above, we agree with the State Department that treating Hong Kong corporations as United Kingdom subjects comports with the facts and the law of alienage jurisdiction. We therefore have jurisdiction of this case under 28 U.S.C. S 1332(a)(2).

II. Facts and Procedural History

As we noted at the outset, this case has a history that is difficult to follow. We attempt to unravel the tangled

_____

executive branch. See, e.g., Chang v. Northwestern Mem'l Hosp., 506 F. Supp. 975 (N.D. Ill. 1980). Formal derecognition had geopolitical causes and consequences far overwhelming diversity jurisdiction, yet courts have not found that derecognition indicated a desire on the part of the executive branch to strip Taiwanese citizens of the benefits of alienage diversity jurisdiction.

narrative by describing the dramatis personae, the essence of the plaintiffs' claims, and then the tortuous course of events that brought the parties to this court.

A. Parties

The plaintiffs are Southern Cross and TIP. Southern Cross, a New Jersey corporation that acted as a booking agent for corporations that transport ocean marine cargo, is wholly owned by a corporation that in turn is at least forty percent owned by Trygve Vangsnes, a Norwegian national.[6] TIP is a Pennsylvania corporation that rents equipment to corporations that transport such cargo. The defendant is Wah Kwong Shipping Group, Ltd. ("Wah Kwong"), a corporation organized under Hong Kong law. Wah Kwong is the parent holding company of a group of subsidiary companies, including Maritime Shipping & Investments, Ltd. ("MSI") and Venture Shipping Managers, Ltd. ("VSM"). Hong Kong residents Frank and George Chao were the chief executives and managers of Wah Kwong and various subsidiaries.

Other entities are also involved in this case. Karlander (Australia) Pty. Ltd. ("Karlander") was an Australian company operating an ocean liner service out of Australia. Until 1983, Karlander chartered five vessels from shipowning companies in which MSI owned shares, at which time Karlander went into arrears. Karlander was reorganized and the liner service was separately incorporated as KKL Kangaroo Lines ("KKL"). Vangsnes was owner and chief executive officer of KKL. Southern Cross and TIP provided services to KKL, which called on ports in New Jersey before it ceased doing business in 1986. At that time, KKL allegedly owed money to Southern Cross and TIP.

B. Pre-litigation Activity

The plaintiffs' claims spring from a series of agreements between Wah Kwong or its subsidiaries and KKL. The agreements apparently involved a $6 million loan from Wah Kwong that enabled KKL to continue in business. However,

_____

6. Southern Cross apparently filed a Chapter 11 petition in 1986, which was confirmed by the Bankruptcy Court in 1994. Accordingly, it may lack present existence, although the parties do not discuss the issue.

the plaintiffs argue that the agreements actually established a partnership relationship between Wah Kwong and KKL's other principal (Vansgnes).

In particular, the plaintiffs argue that convoluted agreements, subagreements, collateral agreements--many of which cancelled prior agreements--addenda, and side letters were used to construct KKL. Thus, while Wah Kwong ostensibly made a loan to start KKL, backed by a demand note and stating an interest rate, the plaintiffs submit that in fact this "loan" was for show and did not reflect the true equity relationship between the parties. The plaintiffs allege that Wah Kwong was entitled to receive and retain KKL's profits over $100,000 and that the $6 million was the cost of buying into KKL's business. Moreover, the $6 million went back to Wah Kwong via intermediaries immediately after the "loan" was made.

The basic substance of the written agreements was as follows: Karlander chartered vessels from shipowning companies in which MSI and VSM had interests. The payments ("charterhire") accumulated and became overdue. Karlander's owners decided to restructure the company by forming KKL to operate Karlander's Australian-U.S. liner service; KKL undertook Karlander's charters with the shipowning companies and assumed outstanding charterhire. At about the same time, Wah Kwong sought advice from its accountants at Price Waterhouse, who suggested five ways Wah Kwong might respond to the restructuring and the unpaid charterhire, including the injection of $6 million as a loan to KKL. In March 1983, Wah Kwong and Karlander entered into a "Loan Facility" under which MSI would provide up to $6 million to Karlander to pay off overdue charterhire.

On November 26, 1983, Karlander, KKL and Wah Kwong executed a document called the Heads of Agreement. This document provided that English law would govern its interpretation. Vangsnes and Frank Chao signed for all parties, including various holding companies controlled by Wah Kwong and others controlled by Vangsnes. Southern Cross was one of those companies, though Southern Cross's CEO has submitted an affidavit that Vangsnes was

15

never authorized to sign documents on behalf of Southern Cross.

Noting that Karlander was indebted to Wah Kwong and 839<!>that Karlander's successor, KKL, required financial assistance to pay off Karlander's creditors, the Heads of Agreement provided that MSI would make a $6 million interest-free deposit, repayable on demand, with afinance company established as a wholly-owned subsidiary of KKL. The finance company then would advance the deposit to KKL, which would advance the money to Karlander to pay off the outstanding charterhire. As security for the $6 million deposit, KKL granted MSI an option to acquire half of KKL's stock. (KKL's main asset at that point was its rights in an arbitration proceeding between Karlander and the Weyerhauser company.)

The Heads of Agreement also authorized MSI to appoint two members of KKL's board of directors, at least one of whom was required for a quorum; to appoint a financial consultant to KKL; and to approve KKL's auditors. The agreement additionally allowed MSI to appoint two members of the boards of directors of the holding companies, including Southern Cross.

The Heads of Agreement stated that it would not become effective until additional documents were executed. One such document, a side letter signed the same day as the Heads of Agreement, noted that repayment of the $6 million deposit "is by mutual agreement instead of on demand." Another document, the Supplemental Agreement, warranted that KKL's total outstanding debts were not more than $10.6 million, and stated that if that representation were false, MSI would be entitled to demand repayment of the $6 million. The Supplemental Agreement also established a two-person committee, including one MSI nominee, to monitor KKL's cash flow and recommend guidelines for payments to creditors.

In accordance with the Heads of Agreement and the related agreements, on February 6, 1984, VSM drew a $6 million check on MSI's account payable to KKL's subsidiary. The subsidiary endorsed the check to KKL, which endorsed it to VSM as the shipowners' agent in

16

payment of outstanding charterhire. Thus, the loan proceeds returned to Wah Kwong-controlled companies. On February 22, 1984, George Chao sent Vangsnes a notice of default indicating that KKL's total outstanding debts in fact exceeded $10.6 million. On March 2, 1984, the parties executed a document providing for the assignment of KKL's and Karlander's ship-operation earnings to VSM as "security for the various obligations" to MSI and VSM. The agreement provided that KKL's earnings would be paid to VSM-designated bank accounts, though such earnings first would be applied to charterhire due to shipowners. Wah Kwong represents that the Assignment of Earnings was never implemented.

In April 1984, the parties agreed that the finance committee provided for in the Supplemental Agreement would be replaced by an arrangement in which the Wah Kwong-nominated members of the KKL board would examine KKL's various expenditures. In August 1984, Vangsnes agreed that all KKL checks would be signed jointly by Wah Kwong and KKL representatives. The plaintiffs assert that Wah Kwong took further steps to ensure its control of KKL's expenses, including entering into agreements with two principal booking agents in the U.S., Great Lakes Overseas, Inc. ("GLO") in the midwest and Southern Cross in New Jersey, to arrange for booking services and provide customers to KKL. Wah Kwong also sent two employees to New Jersey and stationed them on Southern Cross's premises to ensure that only properly approved expenses would be paid in the U.S.; these employees remained in New Jersey for almost two years.

The plaintiffs argue that Wah Kwong's representatives essentially raided KKL, paying sums owed to Wah Kwong subsidiaries ahead of the priority actually allowed to them under the various agreements. It was this activity, according to the plaintiffs, that led to KKL's liquidation. At the time KKL stopped doing business in January 1986, it still carried the $6 million to Wah Kwong on its books as a debt, along with other accumulated arrearages, including debts to the plaintiffs.

C. The Australian Liquidation and Litigation

KKL went into liquidation in January 1986 in New South Wales when it lacked funds to pay its creditors. A liquidator

appointed by the Australian courts assumed control and discontinued KKL's operations. The liquidator agreed to repay $6 million to Wah Kwong as a priority creditor. This agreement was incorporated in a confidential settlement with various Wah Kwong companies dated May 14, 1986, which indicated that Wah Kwong was owed $20 million in past-due charterhire and that Wah Kwong was a creditor and not a partner. The plaintiffs allege that Wah Kwong submitted "show" documents to the liquidator to prove its creditor status and persuaded the liquidator to forgo suing Wah Kwong in exchange for Wah Kwong's agreement to finance certain collateral litigation. Southern Cross and TIP were KKL creditors in this liquidation.

In 1994, the liquidator petitioned Justice Bryson of the Supreme Court of New South Wales for direction to close the proceedings in Australia, because KKL had been wound down. Vangsnes and TIP filed an application for leave to intervene and argued that Wah Kwong had misrepresented itself as a creditor. Justice Bryson rejected this argument, finding no evidence of fraud and expressing concerns about the statute of limitations, and refused to reopen the liquidator's 1986 decision. In 1996, Vangsnes filed an application to inspect correspondence and other documents in the possession of the liquidator relating to the KKL liquidation. An Australian master rejected the application in light of Justice Bryson's decision.

D. The New Jersey Bankruptcy Proceeding (The Interpool Litigation)

In early 1986, certain of KKL's U.S. creditors filed complaints in the U.S. District Court for the District of New Jersey seeking writs of maritime attachment against KKL's freights. Three KKL creditors filed a Chapter 7 involuntary bankruptcy petition against KKL in the U.S. District Court for the Central District of California. All cases were consolidated and transferred to the U.S. District Court for the District of New Jersey. See Interpool, Ltd. v. Certain Freights of M/V Venture Star, 102 B.R. 373 (D.N.J. 1988), appeal dismissed, 878 F.2d 111 (3d Cir. 1989). Southern Cross was a named party in the consolidated action, because its assets were attached by KKL's other creditors, and TIP was a KKL creditor.

In February 1986, the Australian liquidator brought an 11 U.S.C. S 304(a) proceeding ancillary to a foreign proceeding in New Jersey Bankruptcy Court, seeking to enjoin the U.S. creditors from proceeding against KKL's U.S. assets and to remit those assets to Australia for administration in the liquidation there. The S 304 proceeding was transferred and consolidated with the other pending proceedings. The District Court entered an interim order enjoining the U.S. creditors from proceeding against KKL's assets and later ordered that KKL's freights should be distributed among the liquidator and the creditors. In February 1988, the liquidator moved to dismiss the pending involuntary Chapter 7 petition and thereby administer all KKL assets in Australia. On October 14, 1988, Judge Politan denied the motion and held that KKL's U.S. assets should be administered in a Chapter 7 bankruptcy case. He reasoned that the Australian liquidation proceedings (1) were already underway and (2) were being conducted ex parte, which under the circumstances made it highly unlikely that the rights of U.S. creditors would be properly respected. He therefore authorized the appointment of a Chapter 7 trustee.

We quote Judge Politan's opinion at length, because it is vital to our resolution of this appeal:

> On November 26, 1983, KKL executed a "Heads of Agreement," assuming the business of Karlander. KKL also agreed to pay off Karlander's creditors. In turn, Karlander transferred its rights in the Weyerhauser arbitration to KKL in January 1984. KKL received a loan of $6 million from a Wah Kwong subsidiary, and in exchange, KKL assigned its rights in the Weyerhauser arbitration to Wah Kwong. The repayment method to Wah Kwong for this loan was unclear. According to the Heads of Agreement, it was to be on demand. However, according to a letter dated November 26, 1983, repayment was to be by mutual agreement. Again, on January 11, 1984, a letter was sent to KKL from a Wah Kwong subsidiary, stating that unless outstanding debts exceeded $10,122,000, repayment of the loan would be by mutual agreement.

19

The relationship between Wah Kwong and KKL was described as a joint venture agreement. Wah Kwong corporate individuals were considered to be partners for the purpose of "earnings or distribution of earnings" of KKL. On March 2, 1984, KKL assigned its earnings to Wah Kwong through another Wah Kwong subsidiary. In addition, by letter dated March 3, 1984, the parties agreed to take care to ensure that "day to day liner service operations will be maintained without any interruption." By agreement, dated October 8, 1984, KKL and Wah Kwong agreed to require joint signatures on all KKL checks.

In January 1986, a vessel was arrested in L.A., and Wah Kwong issued a press release saying KKL owed[it] $10 million. Wah Kwong blocked payments to creditors who in turn shortened their credit terms and forced a shortage of funds from KKL. Soon after, KKL ceased doing business and Wah Kwong also went into receivership.

On May 14, 1986, an agreement ("Deed") was consummated between the Liquidator, KKL, Karlander, and several Wah Kwong subsidiaries which concerned the prospective proceeds of the Weyerhauser arbitration pending in San Francisco, California between Karlander and Weyerhauser Co. (Weyco). Karlander had previously assigned its rights in the arbitration outcome on January 10, 1984 to KKL. KKL, in turn, assigned its rights in the arbitration outcome to a Wah Kwong subsidiary, as security for repayment of the $6 million loan. Under the terms of the "Deed," any proceeds from Weyco claims would be paid to the Liquidator. The Liquidator, in turn, agreed to distribute the first $6 million to a Wah Kwong subsidiary in satisfaction of the loan. Following distribution of some other monies, the rest of the proceeds would be held by the Liquidator for the purposes of administering KKL while in bankruptcy.

A second agreement, dated May 14, 1986, also entitled "Deed", stated that the shipowners had "suffered damages as a result of a breach by KKL of the terms and conditions of its charters." There is a

20

disagreement as to whether this was true, with KKL asserting that Wah Kwong was in breach by milking it of funds and Wah Kwong asserting that KKL could not meet its obligations and therefore [that Wah Kwong] was entitled to the funds. Both "Deeds" were submitted to the Australian Courts and were approved.

. . . .

Since, in this case, the creditors were not notified prior to the date the Court ratified the agreement between the Liquidator and Wah Kwong, and in addition, were not notified of the original S 304 filing, this Court finds that the procedural protections available to creditors in the United States were not given to the United States creditors in Australia. This is a serious omission.

. . . .

. . . . Wah Kwong's loan was made payable either on demand or by mutual agreement; Wah Kwong's president sat on the Board of Directors of KKL; and someone from Wah Kwong was required to co-sign checks prior to issuance. Additionally, it was Wah Kwong who allegedly overdrew on monies held by KKL which hampered its ability to pay creditors and led to the involuntary petition being brought against KKL. On its face there appear to be substantial allegations of insider machinations . . . .

Both the laws and the public policy of the United States will be violated if the case is permitted to proceed under Australian law. The claims of the creditors may have already been prejudiced by the dealings between the Liquidator and Wah Kwong, and this Court does not intend to stand idly by while United States[ ] citizens and creditors are harmed.

Interpool, 102 B.R. at 375-76, 379, 380.

On April 5, 1988, the U.S. bankruptcy trustee entered into a settlement with MSI. The settlement included a full release by the trustee of KKL's claims against MSI, Wah Kwong, and all other Wah Kwong subsidiaries that had dealt with KKL. It also included an agreement that MSI

21

would fund prosecution of KKL's arbitration claim against the Weyerhauser Company, which the trustee regarded as KKL's principal asset. The settlement also recognized MSI as a KKL creditor and agreed to share proceeds of the Weyerhauser claim. The settlement was approved by the District Court.

E. The Illinois Litigation

GLO, which was a shipping agent and a KKL creditor, sued Wah Kwong in federal district court in Illinois in 1989. GLO, like Southern Cross, is wholly owned by a corporation that is at least forty percent owned by Vangsnes. Although GLO sought compensation in the liquidation proceedings, it was unsuccessful, and it sued Wah Kwong on the theory that Wah Kwong entered into a partnership or alter-ego relationship with KKL, making it responsible for KKL's debts. Wah Kwong once again took the position that it was a creditor, not a partner, and that the court therefore lacked personal jurisdiction over it.

According to GLO, a partnership existed because Wah Kwong had a right to receive a share of KKL's profits, agreed to share KKL's losses, and exercised general control over KKL. The Court of Appeals for the Seventh Circuit, affirming the decision of the District Court for the Northern District of Illinois, held that English law applied, which put the burden of proof of demonstrating partnership on GLO. See Great Lakes Overseas, Inc. v. Wah Kwong Shipping Group, Ltd., 990 F.2d 990, 994 (7th Cir. 1993) ("GLO"). The court found that the central issue was the characterization of Wah Kwong's $6 million payment to KKL. Wah Kwong described the transaction as a loan that was part of a workout arrangement through which Wah Kwong could obtain the charterhire KKL owed it. GLO, on the other hand, asserted that the $6 million was not an enforceable debt obligation but essentially an equity investment by Wah Kwong in a partnership with KKL.

The court in GLO held that the $6 millon was in fact a loan, and that the Wah Kwong-KKL relationship was therefore a creditor-debtor relationship and not an equity arrangement. Although the side letters indicated that the money was repayable "on mutual agreement," Wah Kwong

22

was entitled to demand repayment if KKL's liabilities exceeded $10.6 million, a situation which in fact developed. Moreover, English law recognizes that, under appropriate circumstances, transactions may be "loans" even when repayment of the loan is only by mutual agreement. See id. at 995 n.7. Furthermore, the court found that Wah Kwong was not entitled to share in KKL's profits, as a partner would be. The close corporate relationship between KKL and Wah Kwong, the court concluded, could readily be explained as an arrangement by which Wah Kwong could attempt to obtain money due on the ships it had chartered to KKL, especially in light of the fact that this arrangement was recommended by Price Waterhouse as a way to protect Wah Kwong's position as a major KKL creditor. See id. at 996.

The immediate consequence of the decision that Wah Kwong was a creditor was that there was no personal jurisdiction over Wah Kwong, which could only be haled into Illinois courts if it had a partnership or alter-ego relationship with KKL. See id. at 998. The plaintiffs here contend that the Seventh Circuit misinterpreted the various agreements between the parties and relied on certain paragraphs that were made ineffective by amendment in later agreements, thus erroneously finding a debtor-creditor relationship. They also contend that depositions in the GLO case revealed important elements of Wah Kwong's fraudulent scheme: George and Frank Chao, it is contended, admitted that Wah Kwong overdrew on KKL earnings to pay themselves charterhire in excess of that to which they were entitled under their agreement with KKL, while KKL was neither insolvent nor in arrears on charterhire payments. The plaintiffs argue that, because they were not parties to the Illinois litigation, this evidence only became available to them in late 1992 (Southern Cross) and mid-1993 (TIP).

F. The Present Dispute

On December 6, 1996, Southern Cross and TIP filed a complaint in federal district court in New Jersey alleging a fraudulent breach of contract by Wah Kwong and seeking damages of $7.2 million. The plaintiffs alleged that, when KKL went into liquidation, it owed them substantial sums

23

for services rendered. The plaintiffs' theory was essentially that Wah Kwong controlled KKL, looted the company and drove it into bankruptcy, and then, adding insult to injury, distanced itself from KKL so as to be treated as a preferred creditor, rather than a partner responsible for KKL's debts. Thus, the plaintiffs are attempting to recover from Wah Kwong the money that KKL owed them, along with associated damages.

The complaint alleged that Wah Kwong knew that it was participating in a partnership that was to share KKL's profits and losses. It further alleged that Wah Kwong and its principals consistently misrepresented this relationship to the Australian liquidator, the District Court for the District of New Jersey, the U.S. bankruptcy trustee, the District Court for the Northern District of Illinois, and the Court of Appeals for the Seventh Circuit. These knowingly false representations are said to have enabled Wah Kwong to enter into settlement agreements with the liquidator and the trustee that resulted in an estate with insufficient funds to pay its creditors. Judge Thompson granted Wah Kwong's 12(b)(6) motion on the ground that the statute of limitations had run.

III. The Statute of Limitations

A. The District Court's Opinion

The District Court reasoned that the purported misrepresentations occurred prior to January 1986, since on the plaintiffs' own allegation it was at that time that the Australian liquidator directed that the $6 million loan be repaid by KKL. Under New Jersey law, the statute of limitations for fraud is six years, see N.J. Stat. Ann. S 2A:14-1, and a cause of action accrues when a plaintiff knows or should know of its existence, see Bougher v. University of Pittsburgh, 882 F.2d 74, 80 (3d Cir. 1989). The plaintiff must be aware of an injury and a causal relationship between the injury and an actor, but need not know that the conduct is tortious or legally wrongful. See Baird v. American Med. Optics, 713 A.2d 1019, 1026 (N.J. 1998). When the gist of the action is fraud concealed from the plaintiff, the statute begins to run on discovery of the

24

wrong or of facts that reasonably should lead the plaintiff to inquire into the fraud. See N.J. Stat. Ann. S 2A:14-1; Lopez v. Swyer, 300 A.2d 563, 567 (N.J. 1973).

The District Court held that the plaintiffs had notice of the alleged misrepresentations at the time they were made and that there was no reason to toll the statute. The court noted that the Australian liquidator had agreed that Wah Kwong was a creditor in the 1986 settlement agreement, thus demonstrating that Wah Kwong's position was open and notorious. The court also reasoned that Vansgnes was involved in the Australian liquidation on behalf of KKL and was aware of the arguments Wah Kwong was making to the liquidator.

B. The Plaintiffs' Arguments

The plaintiffs argue that the District Court failed to draw all reasonable inferences in their favor, as is required when there is a 12(b)(6) motion to dismiss, and that it wrongly assumed the existence of certain facts not evident on the face of the complaint. In this procedural posture, we must take all properly pleaded facts as true. See Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). When the applicability of the statute of limitations is in dispute, there are usually factual questions as to when a plaintiff discovered or should have discovered the elements of its cause of action, and thus "defendants bear a heavy burden in seeking to establish as a matter of law that the challenged claims are barred." Van Buskirk v. Carey Canadian Mines, Ltd., 760 F.2d 481, 498 (3d Cir. 1985). If the complaint's allegations, taken as true, allege facts sufficient to toll the statute of limitations, it must survive a motion to dismiss. See Leone v. Aetna Cas. & Sur. Co., 599 F.2d 566, 569 (3d Cir. 1979).

The plaintiffs allege that, though they were aware of Wah Kwong's position that it was a creditor and not a partner of KKL, they did not have notice that this position was false until they obtained documentary evidence in 1992 after obtaining discovery documents from the GLO litigation. As they point out, as late as 1996, the Australian courts refused to allow the Australian creditors (including Vansgnes and TIP) access to KKL corporate information and

25

Wah Kwong's dealings with the liquidator. They maintain that the statute of limitations did not begin to run until they had some notice that Wah Kwong's misrepresentation was false.

We agree that the mere representation that one is a creditor and not a partner, without more, is not suspicious. While the District Court characterized Wah Kwong's alleged misrepresentation as "open and notorious," it was not openly and notoriously a misrepresentation. One would have to know other facts, not necessarily within the reasonable ken of an unrelated creditor, to know that a party that held itself out as a creditor was in fact a partner. Thus, the limitations period did not start to run when the plaintiffs knew or should have known that Wah Kwong represented itself as a creditor. Rather, the period would begin to run only when they knew or should have known information that would have led a reasonable person to question that representation. See Hauptmann v. Wilentz, 570 F. Supp. 351, 397–98 (D.N.J. 1983), aff 'd without opinion, 770 F.2d 1070 (3d Cir. 1985).

In addition, the District Court should not have imputed Vansgnes's knowledge to Southern Cross and TIP. First, there is nothing in the pleadings or in the published decisions of any court that suggests that TIP is in any way related to Vansgnes. Second, while Vansgnes's ownership of a large amount of Southern Cross stock could potentially justify imputing his knowledge to Southern Cross, such an imputation could not be made in the context of a 12(b)(6) motion. Wah Kwong cites cases concerning shareholder derivative suits for the proposition that Vansgnes and Southern Cross are in privity, but privity means different things in different contexts.

In this case, imputing Vansgnes's knowledge to Southern Cross would require resolving issues of fact. Southern Cross argues that Vansgnes was not authorized to act for it (though he signed the Heads of Agreement on its behalf, allegedly as the result of an error) and that he never communicated any of the relevant facts to it. It submitted an affidavit that Vangsnes was never an officer, employee, agent, director, or shareholder of Southern Cross. Another sticking point is that the complaint and the published

26

judgments do not reveal that Vansgnes participated in the 1986 proceedings, which were kept confidential from nonparticipants. The parties have not directed our attention to the relevant Australian procedures. The Australian liquidator took over the management of KKL, and we cannot find any suggestion that Vansgnes was involved in the Wah Kwong-liquidator settlement negotiations. Possibly he was, and if this were a summary judgment motion we might have the evidence to prove it, but the District Court could not so assume within the 12(b)(6) framework.

If Vansgnes's knowledge in 1986 were dispositive, we would be obliged to reverse, as these are issues not appropriate for judgment on the pleadings. However, Vansgnes was not the only possible source of the plaintiffs' knowledge. We turn, therefore, to the 1988 Interpool decision.

C. The Importance of Interpool

To resolve a 12(b)(6) motion, a court may properly look at public records, including judicial proceedings, in addition to the allegations in the complaint. See City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 259 (3d Cir. 1998) (public records); Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993) (same); Iacaponi v. New Amsterdam Cas. Co., 379 F.2d 311, 311-12 (3d Cir. 1967) (previous litigation referred to in complaint); In re Woodmar Realty Co., 294 F.2d 785, 788 (7th Cir. 1961) (previous opinions); DiNicola v. DiPaolo, 945 F. Supp. 848, 855 n.2 (W.D. Pa. 1996) (same); Kithcart v. Metropolitan Life Ins. Co., 62 F. Supp. 93, 94 (W.D. Mo. 1944) (same), aff'd, 150 F.2d 997 (8th Cir. 1945).

Specifically, on a motion to dismiss, we may take judicial notice of another court's opinion--not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity. See Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991); United States v. Wood, 925 F.2d 1580, 1582 (7th Cir. 1991); see also Funk v. Commissioner, 163 F.2d 796, 800-01 (3d Cir. 1947) (whether a court may judicially notice other proceedings depends on what the

27

court is asked to notice and on the circumstances of the instant case).7

Judge Politan's opinion in Interpool is judicially noticeable. Moreover, it is a document on which the plaintiffs rely, as they specifically reference it in the complaint to show Wah Kwong's fraudulent behavior. We may therefore examine the decision to see if it contradicts the complaint's legal conclusions or factual claims. See City of Pittsburgh, 147 F.3d at 259 (court may examine documents of unquestioned authenticity on which the plaintiff 's claim depends); Pension Benefit Guar. Corp., 998 F.2d at 1196 (same); Romani v. Shearson Lehman Hutton, 929 F.2d 875, 879 & n.3 (1st Cir. 1991) (rejecting a fraud claim in light of the underlying documents, pursuant to a 12(b)(6) motion).

Our inquiry proceeds in two steps. First, we establish that a reasonable creditor who filed a claim in a bankruptcy proceeding would examine published opinions in that proceeding. Therefore, such a creditor "should have known" the contents of a published opinion, for purposes of starting the limitations period. Second, we conclude that Judge Politan's Interpool opinion contained sufficient information to put a reasonable creditor on notice that Wah Kwong's claim to be a mere creditor (and not some kind of "insider" or partner in the affairs of KKL) was suspicious.

_____

7. We have held that a court that examines a transcript of a prior proceeding to find facts converts a motion to dismiss into a motion for summary judgment. See Kauffman v. Moss, 420 F.2d 1270, 1274-75 (3d Cir. 1970). We do not call Kauffman into question when we hold that judicially noticing the existence of a published opinion is proper to resolve a 12(b)(6) motion. Recently, courts and commentators have paid more attention to the distinction between judicially noticing the existence of prior proceedings and judicially noticing the truth of facts averred in those proceedings. See 21 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure: EvidenceS 5106, at 247 (1999 Supp.). It has been suggested that the appropriate analogy is the hearsay rule, which allows an out-of-court statement to be admitted into evidence for purposes other than establishing the truth of the statement. See id.; see also Colonial Leasing Co., Inc. v. Logistics Control Group Int'l, 762 F.2d 454, 459 (5th Cir. 1985) (making the distinction between existence and truth).

28

As a result, the plaintiffs, who were creditors in that proceeding, should have known the relevant facts about Wah Kwong's alleged misrepresentations more than six years before the filing of the complaint, and the statute of limitations bars this suit.

## 1. The Obligations of a Bankruptcy Creditor Filing a Claim

The plaintiffs argue that they were not true parties to the Interpool litigation, but merely filed their claims in bankruptcy court as creditors after receiving notice from the U.S. bankruptcy trustee. Interpool actually involved a number of consolidated creditors' claims against KKL and a distinct S 304 proceeding challenging the propriety of U.S. bankruptcy jurisdiction while the Australian liquidation was already pending. Though Southern Cross was a named party in Interpool, it alleges that it was not involved in litigating the S 304 proceeding and participated actively only in other aspects of the case involving creditors' claims against various freights.

The District Court rejected the plaintiffs' distinction between the S 304 proceeding--in which the allegations of Wah Kwong's misconduct were made--and the run-of-the-mill creditors' claims. It noted that Southern Cross was represented by counsel who entered an appearance in the litigation, and that TIP, though not a named party, filed a claim after receiving notice. According to the District Court, Wah Kwong's arguments were put forth in the S 304 aspect of the litigation and in Judge Politan's opinion, and the plaintiffs neglected their duty of due diligence if they were not aware of Wah Kwong's position. While the District Court should not have taken "arguments" before Judge Politan into account on a 12(b)(6) motion, for the reasons that follow we agree that the plaintiffs should have taken notice of Judge Politan's opinion explaining the appointment of a U.S. bankruptcy trustee despite the ongoing Australian litigation.

First, and at the very least, a reasonable creditor should have inquired why the court found it necessary to have a U.S. proceeding in the face of an ongoing foreign liquidation. Although Southern Cross argues that it did not

29

participate in the S 304 aspect of the Interpool case, the result that the Australian liquidator sought was to void the U.S. attachment of Southern Cross's freights. Southern Cross was served with all relevant papers, and the contention that it was somehow insulated from theS 304 proceedings is simply untenable. In these circumstances, Southern Cross should have examined Judge Politan's opinion resolving the Australian liquidator's S 304 claim.

TIP's obligations as a reasonable creditor are much more difficult to determine. Unfortunately, the record of the Interpool proceedings has not been preserved in its entirety, though there is evidence that, in 1990, the Australian liquidator was unable to serve TIP with documents in the case because it had moved, and its forwarding order had expired. At all events, TIP had notice of the pending U.S. bankruptcy proceeding triggered by Judge Politan's opinion, because it filed a claim in that proceeding.8 Judge Politan's opinion was not simply "notice in the air," as TIP participated in the resultant proceedings. See People v. Hill, 952 P.2d 673, 699-700 (Cal. 1998) (judicially noticing prior opinions to show that a prosecutor involved in the prior cases had notice of a particular problem). We conclude that TIP also should have read Judge Politan's opinion, given the circumstances of the case.

2. The Content of the Interpool Opinion

Because a reasonable creditor in the plaintiffs' position would have read the opinion, the statute of limitations would start to run if the opinion was sufficient as a matter

_____

8. The complaint does not specifically allege that TIP filed a claim in the
U.S. bankruptcy proceeding, though it does allege that the plaintiffs were unsecured creditors and that "the unsecured United States creditors" were harmed by Wah Kwong's representations to the U.S. bankruptcy trustee. Logically, only competing claimants could have been harmed by Wah Kwong's acts, and thus the only reasonable reading of the complaint is that the plaintiffs filed claims. In their brief, the plaintiffs state that they both filed claims in the bankruptcy proceeding. The brief is not evidence, but it allows us to interpret the complaint. See Doe v. Johnson, 817 F. Supp. 1382, 1399 n.13 (W.D. Mich. 1993); Ricciotti v. Warwick Sch. Comm., 319 F. Supp. 1006, 1010 n.3 (D.R.I. 1970); 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure S 1364, at 480-81 (1990).

30

of law to give a creditor notice of the facts underlying the fraud claim. We find that the published opinion in Interpool was sufficient to put the plaintiffs on notice that there was evidence that Wah Kwong was KKL's partner and thus to distrust Wah Kwong's representations that it was a mere creditor. Cf. Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1548 (9th Cir. 1989) (holding that controlling statutory language can be sufficiently clear to start a limitations period running as a matter of law). It is not relevant whether Judge Politan's interpretation of the facts was correct; what is critical is that his interpretation was published and available to KKL's creditors, and that the discrepancy between Wah Kwong's claims to be a creditor and Judge Politan's conclusions was evident on the face of the opinion.

Judge Politan described the Wah Kwong-KKL link as follows: "The relationship between Wah Kwong and KKL was described as a joint venture agreement. Wah Kwong corporate individuals were considered to be partners for the purpose of `earnings or distribution of earnings' of KKL." Interpool, 102 B.R. at 375-76. This adequately disclosed the alleged partnership agreement behind the plaintiffs' claims.

Moreover, the opinion repeatedly indicated that Wah Kwong might have acted illegitimately. Interpool discussed the troubling features of the arrangement between the Australian liquidator and Wah Kwong, which the plaintiffs now attack as fraudulent. Indeed, Judge Politan was so concerned about the fairness of the Australian settlement that he appointed a U.S. bankruptcy trustee to administer KKL's U.S. assets. Furthermore, the plaintiff 's complaint in this case itself demonstrates that the plaintiffs were (or should have been) aware of Wah Kwong's position that it was a creditor, as both the plaintiffs and the defendant were competing creditors in the U.S. bankruptcy proceeding.

In sum, the plaintiffs should have been aware of evidence of the alleged "true facts" after the 1988 Interpool opinion; they were also aware of the allegedly false representation during the bankruptcy proceedings. It follows that they should have known all the information sufficient to begin the running of the statute of limitations, which thus ran on

31

the plaintiffs' fraud claims before the December 6, 1996, complaint was filed. The judgment of the District Court will be affirmed.9

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

_____

9. Because we find that the statute of limitations has run for both plaintiffs, we need not address Wah Kwong's other arguments.